IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CECIL MESSER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 2:21-cv-778-ECM |
| | ) | (WO) |
| ANPHERNE CANTY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

Now pending before the Court is the Defendants Anpherne Canty ("Canty"), Alexander Webb ("Webb"), and Zachary Summerlin's ("Summerlin") motion for summary judgment (doc. 27).

Plaintiff Cecil Messer ("Messer") brings claims against each Defendant for excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 and assault and battery under Alabama law.

Upon consideration of the briefs, evidence, and applicable law, and for the reasons that follow, the Defendants' motion for summary judgment is due to be GRANTED.

## I.  JURISDICTION

The Court has original subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction of the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## II.   LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "[A] court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.*  The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id.* at 1311–12.

2

The Court construes the facts in the light most favorable to the non-movant plaintiff and draws all reasonable inferences in his favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000) ("In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party' and 'resolve all reasonable doubts about the facts in favor of the non-movant.' Moreover, the court must avoid weighing conflicting evidence or making credibility determinations." (citations omitted)).

## III.   FACTS

Plaintiff Cecil Messer is a five-foot-eight white male who, on November 16, 2019, was fifty-six years old and weighed two hundred and fifty-four pounds.  Defendants Canty, Webb, and Summerlin (collectively, "the Defendants") were all officers for the Millbrook Police Department at that time.

On November 15, 2019, Messer drove Lynn Winston ("Winston"), his girlfriend at the time, from his home in Mobile to her home in Elmore County.  Messer, who suspected that Winston was seeing another man, broke up with Winston before dropping her off around 3:00 P.M.  Messer then decided to drive to Montgomery and snort some cocaine, which he did around 6:00 P.M. that day.

After snorting his cocaine, Messer returned to Elmore County to drive around a lake and relax for the next nine hours.  Around 3:00 A.M. on the morning of November 16, Messer started his return drive to Mobile.  As he drove down Cobbs Ford Road towards I-

65, Messer began to suspect that something was wrong with his transmission.  Messer turned on his hazard lights and pulled into the nearby Purple Cow Chevron.

Officer Youngblood ("Youngblood") was stationed on Cobbs Ford Road and saw Messer drive by.  When Youngblood saw Messer's hazard lights flashing, Youngblood thought that Messer was improperly using his turn signals.  Youngblood turned on his police lights and pulled into the Chevron behind Messer.  Youngblood ran a check on Messer's license and asked Messer to get out of his truck[1] so that Youngblood could conduct a sobriety check.

Although Messer believes he was entirely sober at this point, Messer was on federal probation and did not want to take a sobriety test.  After Messer refused to exit the vehicle, Youngblood called for backup.  Hearing Youngblood call for backup, Messer drove out of the Chevron parking lot and merged onto I-65 North.  A vehicular pursuit ensued, with Messer reaching speeds over 100 miles per hour.  Messer admits that he reached such high speeds in an effort to evade the police.  Youngblood was initially part of the pursuit but dropped off when the chase left Millbrook city limits.  Canty, Summerlin, Webb, and State Trooper Brett Wadsworth ("Wadsworth") were all involved in the pursuit or the ensuing aftermath.  Footage from all four officers' body cameras has been submitted into evidence that depicts the officers' efforts to remove Messer from the vehicle.  The following facts are drawn heavily from this footage.

---

[1] The truck Messer was driving that night was borrowed and did not legally belong to Messer.

The vehicular pursuit ends when Messer attempts to drive his truck down a set of railroad tracks in Deatsville, Alabama.  Messer's truck gets lodged between a trench and rocks alongside the railroad tracks.  When Messer's vehicle becomes stuck, Canty approaches the passenger door and instructs Messer to exit the vehicle multiple times.  Messer does not comply.  Unable to open the locked door, Canty shatters the passenger window with his baton and unlocks the door.  Messer continues to attempt to drive the vehicle away.  At this point, Wadsworth deploys his taser.  The taser hits Messer but does not deter Messer's continued efforts to drive the vehicle away.

Canty is a six-foot-four black male and weighed about 280 pounds at the time.  Canty enters the passenger side of the vehicle and removes the key.  Canty then grabs Messer and attempts to pull him out of the vehicle.  Messer claims that at this point Messer rested his hands on the steering wheel and told Canty that he surrendered at least three times.  This verbal surrender is not audible on the body camera footage.  While a physical altercation clearly occurs between Messer and Canty, the footage does not clearly portray the altercation.  Eventually, Canty steps out of the vehicle.

After Canty exits the vehicle, Messer starts reaching around under his seat and on the floorboard.  Messer disregards numerous officer instructions to stop reaching.  Officers explain to Messer that they do not know whether he is reaching for a gun.  Messer tells officers that he does not have a gun and that he is looking for his pictures.[2]  Messer continues to reach around the floorboard.

---

[2] What pictures Messer is looking for and why Messer is looking for pictures at this point in time remains a mystery to the Court.

After about five minutes of reaching around, Messer's truck turns back on[3] and Messer continues his unsuccessful attempt to drive away.  At this point, the truck's tires are spinning, smoke is billowing from the vehicle, and officers warn Messer that his truck is going to catch on fire.  Canty comments that when Messer gets out of the truck, he is going to "fuck that motherfucker up."  Messer continues to try and drive away for about two more minutes.  At this point, officers tell Messer that his truck is starting to catch on fire. Messer unsuccessfully attempts to drive away for about nine more minutes.

Officers next discuss non-lethal strategies to extract Messer from the vehicle.  Webb warns Messer that he is going to shoot Messer with a Bruzer, a non-lethal weapon that fires a beanbag projectile.  Webb calls out "Bruzer! Bruzer! Bruzer!" and shoots a projectile at Messer.  Webb then calls out another warning and shoots a second time.  Though Messer initially recoils from the projectiles, he continues to attempt to drive his vehicle away.

Shortly afterwards, Summerlin approaches the passenger side of the vehicle and deploys OC spray, which is a spray designed to temporarily burn the eyes of the target. Officers convince Messer to exit the vehicle after the OC spray is deployed.  As Messer exits the vehicle, officers bring Messer to the ground on his stomach.  Although officers tell Messer to give them his hands, Messer does not comply.

Several officers pin Messer to the ground as they attempt to place him in handcuffs. A white officer places a hand on the back of Messer's neck.  Canty places his knee on Messer's shoulder.  Nevertheless, Messer holds his arm under his body and disregards

---

[3] Presumably, Messer found a spare key.

officer instructions to quit resisting.  Messer calls out several times during this struggle that he cannot breathe.  Messer claims that he also told officers that his teeth were being broken. The audio from the body camera footage does not support this second claim.  Ultimately, Messer is handcuffed and taken into custody.  While Messer claims that officers shoved his face into the rocks after he was placed in handcuffs, Wadsworth's body camera footage reveals that officers stopped applying force as soon as Messer was successfully handcuffed.

On November 16, 2021, Messer filed a case in this Court bringing Fourth Amendment excessive force claims, pursuant to 42 U.S.C. § 1983, against Canty, Wadsworth, Summerlin, and Webb.  Messer also brought state law assault and battery claims against all four Defendants.  On Messer's motion, the Court dismissed all claims against Wadsworth on September 21, 2022. (Doc. 26).  On October 5, 2022, the remaining Defendants filed a motion for summary judgment on all claims.

## IV.   DISCUSSION

The Court will first address Messer's federal claims and then address Messer's state law claims.

### A. Fourth Amendment Excessive Force

Messer brings excessive force claims against the Defendants for their individual roles in bringing Messer into custody.  The Defendants have moved for summary judgment, asserting the defense of qualified immunity.  Qualified immunity protects government officials from suit when they are "performing discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

7

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Court finds that the Defendants were performing discretionary functions, a fact not disputed by Messer.

Once a government official establishes that he was performing a discretionary function, a plaintiff must satisfy a two-pronged inquiry to defeat a qualified immunity defense. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (quoting *Andujar v. Rodriguez*, 486 F.3d 1199, 1202 (11th Cir. 2007)).  The first prong asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second prong asks whether the violation of the federal right was "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

In excessive force claims under the Fourth Amendment, the Court looks to whether the force exceeds that which would be applied by an objectively reasonable officer on the scene. *Shaw*, 884 F.3d at 1099.  Factors from *Graham v. Connor*, 490 U.S. 386 (1989) guide the court's assessment of reasonableness, and the Court examines "(1) the severity of the crime; (2) whether the individual 'pose[d] an immediate threat to the safety of the officers or others'; and (3) whether the individual 'actively resist[ed] arrest or attempt[ed] to evade arrest by flight.'" *Patel v. City of Madison*, 959 F.3d 1330, 1338–39 (11th Cir. 2020) (quoting *Graham*, 490 U.S. at 396).  The Eleventh Circuit assesses three additional reasonableness factors: "(4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury." *Id.* at 1339.  As this

Court is bound to examine all six factors, the Court refers to these factors collectively as the *Graham* factors.

When determining whether a violation is clearly established, the relevant question is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.  The unlawfulness of such conduct can be clearly established in three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009).

As an initial matter, Messer claims that the Defendants applied excessive force by pressing Messer's face into the rocks after he was handcuffed and subdued.  Messer does not clearly identify the Defendant against whom this claim is asserted.  However, the footage from Wadsworth's body camera reveals that Canty was not the officer who placed a hand on the back of Messer's neck.

Notwithstanding Messer's failure to attribute this allegation to a particular officer, this claim does not survive summary judgment.  Wadsworth's footage reveals that officers stopped applying force immediately after Messer was handcuffed.  The footage also reveals that Messer resisted officers until this point.  When a suspect resists arrest, a reasonable officer may find it necessary to use force to keep that suspect "completely flat and immobile until he [is] successfully handcuffed." *Crosby v. Monroe Cnty.*, 394 F.3d 1328,

1335 (11th Cir. 2004). "[E]ven when that force is severe, [it] is not necessarily excessive." *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015). Here, neither the force used, nor Messer's injury, was severe. The force used was reasonably applied to immobilize Messer until he was successfully handcuffed. The Defendants are entitled to summary judgment on Messer's excessive force claims to the extent Messer asserts a claim that officers applied excessive force by pressing his face into the rocks.

### 1.  Claims Against Canty

Messer asserts that Canty applied excessive force on two occasions: first by beating Messer inside his vehicle and second by applying pressure to Messer's shoulder while officers handcuffed Messer. Messer argues that a reasonable jury could determine that Canty beat Messer inside his vehicle after Messer verbally and physically surrendered. Messer also argues that a reasonable jury could find that placing a knee on Messer's shoulder while Messer was being handcuffed was excessive force. Messer argues that a material question of fact remains on these issues because the body camera footage does not clearly depict what took place on either occasion. Because the video footage is unclear, Messer argues that the Court cannot determine whether Messer was resisting and must accept Messer's assertions that he was not.

What Messer disregards in his argument, however, are the acts that led to Canty's uses of force. Courts do not look at isolated moments but rather the entire scenario that leads to an officer's use of force. *See Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (holding it objectively reasonable for officer to doubt suspect's attempt to surrender

because suspect "up to that point, had shown anything but an intention of surrendering."). Examining the reasonableness of Canty's conduct under the *Graham* factors, no constitutional violation occurred.

The first *Graham* factor looks to the severity of the suspect's crime. Here, Messer's initial crime was minor. Youngblood suspected that Messer committed a traffic violation and questioned Messer's sobriety. The severity of Messer's crime increased, however, after Messer declined to take a sobriety test, fled the scene, and led officers on a dangerous high-speed chase. This factor weighs in favor of the Defendants.

The second *Graham* factor, whether the suspect posed an immediate safety threat to officers or others, weighs heavily in favor of the Defendants. Messer's pattern of volatile, unpredictable, and reckless behavior would give any reasonable officer reason to believe that Messer posed an immediate safety threat to everyone around him. Messer's initial decision to flee from Youngblood rather than take a sobriety test revealed volatile tendencies and poor judgment. Leading police on a high-speed chase demonstrated Messer's willingness to place himself and others in danger. At any point during the pursuit, an officer, Messer, or an innocent bystander could have been severely injured. Messer's decision to lead the chase onto railroad tracks forced officers to drive offroad and further placed Messer and officers at the risk of being struck by a train. After Messer's vehicle became stuck, Messer refused to comply with officer commands and continued to attempt to drive his vehicle away. Messer continued this irrational behavior after Canty broke his passenger window and after Wadsworth deployed a taser.

Messer's erratic behavior frames Canty's use of force in the vehicle.  A reasonable officer would have reason to fear that Messer would harm an apprehending officer.  Even accepting Messer's testimony that he verbally surrendered, the Court finds that a reasonable officer in Canty's position may doubt the legitimacy of Messer's surrender. *See id.* (holding it reasonable for officer to doubt suspect's attempt to surrender because suspect "up to that point, had shown anything but an intention of surrendering.").  Messer claims that he also indicated his intent to surrender by placing his hands on the steering wheel. The Court would point out that until this point, Messer's hands were on the steering wheel in his effort to drive away and further flee police.  A reasonable officer would give no credence to this physical gesture.  At the time Canty entered the vehicle, a reasonable officer would have strong reason to fear immediate harm despite Messer's indications of surrender.[4]

The threat of immediate harm only intensified as events continued.  Messer struck Canty numerous times inside the vehicle such that Canty, a physically imposing officer, retreated.  Messer then reached around the truck's floorboard despite officer warnings that doing so made them fear that Messer had a weapon.  Messer then started his truck again and continued his attempt to drive away despite countless officer instructions to stop, smoke billowing from his vehicle, and officer warnings that his vehicle was catching on fire.  Messer continued his fruitless attempts to escape even after being shot twice by a Bruzer.  Messer did not comply with officer instructions to exit the vehicle until Summerlin

---

[4] The Court would also note that when Canty entered the vehicle, Messer had not complied with officer instructions to get out of the vehicle.

deployed OC spray.  By this time, any reasonable officer would be on high alert that Messer posed an immediate threat to others while he was being handcuffed.

The third *Graham* factor looks to whether the suspect attempted to avoid arrest by flight.  This factor clearly weighs in Canty's favor.  Messer led officers on a lengthy high-speed chase.  Messer admits that he initiated the chase to flee from police.  Messer irrationally continued this attempt to flee after his vehicle became hopelessly entrenched.  Messer's argument to the contrary is unavailing.

The fourth and fifth factors examine the level of force used versus the need to apply force in that situation.  As discussed, Messer acted unpredictably in his efforts to avoid arrest.  Extracting Messer from the vehicle as quickly as possible was imperative to ensure the safety of everyone on the scene.  When Canty entered the vehicle, a taser had already been deployed, and verbal commands proved ineffective.  The situation thus presented a significant need for force, and applying physical force was a reasonable next step to remove Messer from the vehicle.  Placing Messer in a headlock was a reasonable method to prevent Messer from harming Canty.  As Messer continued to resist and struck Canty, the need to use physical force was extremely high.  Messer has not established that Canty applied force that was disproportionate to the situation Messer created.  Both factors weigh in Canty's favor for the physical altercation inside the vehicle.

The same is true for when Canty placed his knee on Messer's shoulder while officers handcuffed Messer.  Messer's threat level was extremely high, particularly considering that Messer remained non-compliant after officers deployed a taser, a Bruzer, and OC spray.  Officers needed to handcuff Messer quickly to prevent any further erratic behavior.  A

reasonable officer in this situation would see a need to use physical force, such as pinning Messer to the ground, to safely accomplish this goal. *See Crosby*, 394 F.3d at 1335.  Placing a knee on Messer's shoulder was a reasonable way to do so.  Further, the handcuffing was accomplished relatively quickly, considering Messer's continued resistance.  Thus, these two factors also weigh in Canty's favor for the force he used while Messer was being handcuffed.

The final factor looks to the severity of the injury.  Messer complains that he experienced shoulder pain and broken teeth from being pressed into the rocks.  Messer does not point to any injuries from his physical altercation with Canty in the vehicle.  Messer's injuries from being handcuffed are relatively minor when compared to the situation.  Messer's teeth were successfully repaired, and Messer did not sustain any permanent injuries.  Messer's continued refusal to comply provided officers on the scene good reason to fear for their lives, and they were justified in using force to gain control of the situation.  Messer's injuries are minor compared to the scale of the situation.  This factor, too, weighs in Canty's favor.

Looking at the factors collectively, all six weigh clearly in Canty's favor regarding his uses of force.  Canty acted as a reasonable officer would in the situation: he applied physical force in an effort to extract a volatile, non-compliant suspect from a vehicle and later applied physical force to ensure that he was successfully handcuffed.  In both instances, Canty had reason to doubt any manifestation of surrender Messer conveyed.  As such, Canty's uses of force were reasonable and did not violate Messer's Fourth

Amendment rights.  Accordingly, Canty's motion for summary judgment on these claims is due to be granted.

  2.  Claims Against Summerlin

Messer's complaint alleges that Summerlin applied excessive force by deploying OC spray when Messer was not resisting.  Although Summerlin moves for summary judgment, Messer does not address this claim in his response.  As a result, Summerlin argues that Messer has abandoned this claim.

Notwithstanding the fact that it appears to the Court that Messer has abandoned this claim, Summerlin did not apply excessive force.  Although Messer claims he was not resisting when the OC spray was deployed, body camera footage reveals otherwise.  When Summerlin deployed the OC spray, Messer was trying to drive his vehicle out of the trench to escape police.  Messer ignored countless orders to get out of the vehicle.  Messer's non-compliance persisted despite officer efforts to physically extract him from the vehicle, deployment of a taser, and deployment of a Bruzer.  Messer was actively resisting arrest when Summerlin deployed the OC spray.

The use of OC spray has been found reasonable in similar situations. *Garret v. Athens-Clarke Cnty.*, 378 F.3d 1274, 1281 (11th Cir. 2004) (finding officer's conduct reasonable when officer used OC spray against defendant who led police on vehicular chase and kicked apprehending officers).  As previously discussed, all of the *Graham* factors weighed heavily in Summerlin's favor at the time he deployed the OC spray. Summerlin's use of OC spray was reasonable and did not violate the constitution.  As such,

Summerlin could not have violated a clearly established right.  Summerlin's motion for summary judgment is due to be granted on this claim.

### 3.  Claims Against Webb

Messer's complaint alleges that Webb applied excessive force by deploying a Bruzer after Messer surrendered and did not pose a threat.  Although Webb moved for summary judgment, Messer does not address this claim in his response.  As a result, Webb argues that Messer has abandoned this claim.

Notwithstanding the fact that it appears to the Court that Messer has abandoned this claim, Webb did not apply excessive force.  Although Messer claims he was not resisting when the Bruzer was deployed, body camera footage reveals otherwise.  When Webb deployed the Bruzer, Messer was trying to drive his vehicle out of the trench to escape police.  Messer ignored countless police orders to get out of the vehicle and continued this pattern of non-compliance after officers deployed a taser and physically attempted to remove Messer from the vehicle.  Messer was actively resisting arrest when Webb deployed the Bruzer.

While binding case law offers little guidance on the use of beanbag projectiles like Bruzers, the Eleventh Circuit has classified such force as "somewhere between deadly force and the use of a Taser gun." *Glenn v. City of Columbus*, 375 F. App'x 928, 933 (11th Cir. 2010).  As previously discussed, all of the *Graham* factors weighed heavily in Webb's favor at the time he deployed the Bruzer.  Webb's use of the Bruzer was reasonable and did not violate the constitution.  Even if Webb had violated a constitutional right, due to

the lack of case law on the subject, that right would not have been clearly established. *Id.* at 935. Accordingly, Webb's motion for summary judgment is due to be granted on this claim.

### B. Assault and Battery

The Defendants also moved for summary judgment on Messer's assault and battery claims (doc. 27). Because Messer fails to address these claims in his response to the Defendants' motion for summary judgment, the Defendants argue that these claims have been abandoned. Additionally, the Defendants assert the defense of state agent immunity.

"The plaintiff in an action alleging assault and battery must prove '(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.'" *Harper v. Winston Cnty.*, 892 So.2d 346, 353 (Ala. 2004). Police officers are entitled to state agent immunity from state law claims, such as assault and battery, when they are "exercising judgment in the enforcement of the criminal laws of" Alabama by "arresting or attempting to arrest persons." *Ex parte Cranman*, 792 So.2d 392, 405 (Ala. 2000). State agent immunity does not apply if the officer "acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.*

Messer has wholly failed to address his state law claims in his responsive briefing, and the Court finds that he has abandoned them. Notwithstanding Messer's abandonment of these claims, the Court finds that the Defendants are otherwise entitled to summary judgment. Because the Defendants did not use constitutionally excessive force, they did

not commit assault and battery under Alabama law. *See Davidson v. City of Opelika*, 675 F. App'x 955, 960 (affirming summary judgment in favor of defendant on Alabama assault and battery claim because defendant did not apply constitutionally excessive force).  As such, the Defendants' motion for summary judgment is due to be granted on this claim.

## V.    CONCLUSION

For the reasons discussed above, it is hereby ORDERED as follows:

The Defendants' Motion for Summary judgment (doc. 27) is GRANTED.

A separate Final Judgment will be entered in accordance with this Memorandum Opinion and Order.

Done this 19th day of January, 2023.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE